JOSHUA M. BRIONES (Bar No. 205293)
joshua.briones@dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:  310-595-3000
Fax: 310-595-3300

ALBERT E. HARTMANN (*pro hac vice* pending)
albert.hartmann@dlapiper.com
DLA PIPER LLP (US)
203 North LaSalle Street, Ste 1900
Chicago, IL 60601-1293
Tel:  312-368-4000
Fax: 312-236-7516

VISHALI SINGAL (Bar No. 267481)
vishali.singal@dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA  94105-2933
Tel:  415.836.2500
Fax:  415.836.2501

Attorneys for Defendant and Third-Party Plaintiff
REACH MEDIA GROUP, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID TRINDADE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REACH MEDIA GROUP, LLC, a Delaware limited liability company,<br><br>Defendant.<br><br>REACH MEDIA GROUP, LLC, a Delaware limited liability company,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>RYAN LENAHAN, individually, KYLE DANNA, individually, and EAGLE WEB ASSETS INC., a corporation,<br><br>Third-Party Defendants. | CASE NO  5:12-CV-04759 (PSG)<br><br>(Complaint Filed: September 12, 2012)<br><br>**THIRD-PARTY COMPLAINT OF REACH MEDIA GROUP, LLC FOR:**<br><br>**1) BREACH OF WARRANTY**<br><br>**2) BREACH OF CONTRACT**<br><br>**3) LIBEL PER SE**<br><br>**4) TORTUOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**5) TORTUOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**DEMAND FOR JURY TRIAL** |

**THIRD-PARTY COMPLAINT**

Third-Party Defendant REACH MEDIA GROUP, LLC, a Delaware limited liability company ("RMG"), for its Third-Party Complaint against RYAN LENAHAN, individually, KYLE DANNA, individually, and EAGLE WEB ASSETS INC., a corporation organized and existing under the laws of Illinois (collectively, "Third-Party Defendants"), alleges as follows:

**INTRODUCTORY ALLEGATIONS**

1.      RMG is a leading performance based publisher network that provides advertisers with a single stop solution for scaling their affiliate market solutions.

2.      In a class action filed on September 12, 2012, Plaintiff David Trindade ("Plaintiff") sued RMG for allegedly violating the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*  Plaintiff contends that RMG repeatedly made or directed to be made on its behalf unsolicited text message calls to cellular telephone numbers belonging to Plaintiff and the other members of the alleged Class, for the purpose of "driv[ing]e consumers to information collection websites and payday loan offers", without their prior express consent, and thus, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).  (Dkt. 1, ¶¶ 1-4, 39.)  Among other examples, Plaintiff alleges that RMG made, or had made on its behalf, an unsolicited text message to Plaintiff's cellular phone on August 13, 2012, stating: "Lenders offering $1,500 cash loans deposited within 2hrs.  NO credit checks!  Get money today by applying right now directly on your phone at www.TwoHourCash.com."  (Dkt. 1, ¶ 17.)  Furthermore, Plaintiff contends that these text message calls caused Plaintiff and the members of the purported Class "actual harm, including the aggravation and nuisance that necessarily accompanies the receipt of unsolicited text message calls, and the monies paid to their wireless carriers for the receipt of such text message calls." (Dkt. 1, ¶¶ 1-4, 39.)  RMG denies Plaintiff's claims and denies any liability for any damages alleged by Plaintiff.

3.      As a publisher network, RMG frequently enters into agreements with third party publishers for the publication of advertisements.  These agreements govern the content of the advertisements, the terms of payment to the third party publishers, the representations and warranties by the third party publishers, and the nature of the relationship between RMG and the

1   third party publishers, among other things.  To join RMG's publisher network, a publisher must

2   submit an application on RMG's website, available at http://www.reachmediagroup.com/signup.

3   By submitting this application, the publisher agrees to RMG's Terms and Conditions

4   ("Agreement"), which is located on the application page and accessible for review before a

5   publisher submits an application.

6        4.     Within the past five months,  each of the Third-Party Defendants, Ryan Lenahan

7   ("Lenahan"), Kyle Danna ("Danna"), and Eagle Web Assets Inc. ("EWA") applied on RMG's

8   website to join RMG's publisher network.  In so doing, they agreed to the Terms and Conditions.

9   Each of the Third-Party Defendants also agreed to Insertion Orders which specified the

10  advertising campaigns for which they would publish advertisements specified by RMG, also

11  called RMG's Creatives, and start and end dates for the campaigns, among other things.

12       5.     The Agreements into which each of the Third-Party Defendants entered were

13  identical to one another and specified that each party to them were independent contractors, not

14  authorized or empowered to obligate the other or incur any costs on behalf of the other without

15  the other party's prior written consent.  Attached hereto as Exhibit A, and incorporated herein by

16  this reference, is a true and correct copy of the Terms and Conditions.  Additionally, the

17  Agreements required Third-Party Defendants to display an advertisement and perform lead

18  generation services in accordance with accompanying Insertion Orders.  Furthermore, each

19  Agreement prohibited editing to RMG's Creative without the prior written consent of RMG, and

20  explained that any violation of this requirement would result in the loss of payment per leads.

21  The Agreements also included a representation and warranty by each Third-Party Defendant that

22  the Third-Party Defendant's efforts in association with the Agreement would comply with the

23  laws of the United States, and any applicable laws of any other jurisdiction, and that the Third-

24  Party Defendant would not engage in or promote any illegal activities of any kind in association

25  with the Agreement.

26       6.     RMG is informed and believes, and thereon alleges, that each Third-Party

27  Defendant breached their warranties under the Agreements by sending text messages to cellular

28  phone numbers without the prior express consent of the called parties.  Moreover, RMG is

1   informed and believes, and thereon alleges, that Third-Party Defendants also breached the

2   Agreements by sending text messages to cellular phone numbers that did not comply with RMG's

3   Creatives, without receiving prior written approval from RMG.

4          7.     Third-Party Defendants Lenahan and EWA are now engaged in defamatory

5   conduct apparently intended to smear the reputation of RMG and its President and Chief

6   Executive Officer, Roger Dowd ("Dowd"). The damaging conduct of Third-Party Defendant

7   Lenahan has already deteriorated RMG's relationship with one of its largest customers, and is

8   intended to further interfere with RMG's existing and future contractual relations, as well as its

9   prospective economic advantage.

10         8.     Under the terms of the Agreements, RMG is not liable for any damage caused by

11  Third-Party Defendants Lenahan, Danna, and EWA, arising out of or in connection with the

12  Agreements. Moreover, the Agreements specify that under no circumstances shall RMG be liable

13  to publishers or any third parties "for any reason." (Ex. A, ¶ 15.) Rather, Third-Party

14  Defendants are required to indemnify, defend and hold harmless RMG and its employees, agents,

15  officers and directors, against claims, causes of actions, judgments, demands, damages, losses or

16  liabilities, including costs and expenses, arising out of or relating to any breach of any

17  representation or warranty in the Agreement, among other things. (Id., ¶ 16.) Accordingly, to the

18  extent Plaintiff or purported Class members have suffered damages in relation to text messages

19  described in Plaintiff's Complaint and those text messages were sent by Third-Party Defendants,

20  Third-Party Defendants, and each of them, are the actual and proximate cause of any such

21  damage and liable to Plaintiff for such harm, if any.

22  **THE PARTIES AND JURISDICTION**

23         9.     Defendant and Third-Party Plaintiff RMG is a limited liability company organized

24  and existing under the laws of the State of Delaware. Its principal place of business is located at

25  3715 Northside Parkway, Building 100, Suite 300, Atlanta, Georgia 30327. RMG conducts

26  business in the State of California and in this District.

27         10.    Third-Party Defendant Ryan Lenahan ("Lenahan") is a natural person and resident

28  of the State of California.

11.    Third-Party Defendant Kyle Danna ("Danna") is a natural person and resident of the State of Louisiana.

12.    Third-Party Defendant Eagle Web Assets Inc. ("EWA") is a corporation organized and existing under the laws of the State of Illinois. Its principal place of business is located at 9933 Lawler, Suite 355, Skokie, IL 60077. EWA conducts business in the State of California and in this District.

13.    This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

## VENUE

14.    Venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## LEGAL BASIS FOR THIS THIRD-PARTY COMPLAINT

15.    Third-Party Defendants, and each of them, are parties to the Agreements with RMG. The Agreements contain the following indemnification provision, stated in its entirety here:

> Each party agrees to indemnify, defend and hold harmless the other party and its employees, agents, officers and directors, against any and all claims, causes of actions, judgments, demands, damages, losses or liabilities, including costs and expenses (including reasonable attorneys fees and costs of suit), arising out of or relating to (a) any claim based upon infringement of copyright, trademark, patent, or trade secret or other intellectual property right of any third party; (b) any claim, representation, or statement made in the Advertisement; **(c) any breach of any representation or warranty contained in this Agreement.**

(Ex. A, ¶ 16) (emphasis added). Under each of the Agreements, each Third-Party Defendant represents and warrants, among other things, that the Third-Party Defendant's

> efforts associated with this Agreement comply with the laws of the United States, and any other laws of any other jurisdictions which are applicable to PUBLISHER. PUBLISHER will not engage in or promote any illegal activities of any kind in association with this Agreement.

(Id. A, ¶ 11.) Because Third-Party Defendants represented and warranted to RMG that they

1  would comply with all federal laws, which include the TCPA, they must indemnify and hold

2  harmless RMG and its employees, agents, officers and directors, against claims, judgments,

3  damages, losses or liabilities, among others, arising out of or relating to their breach of this

4  representation and warranty, including any violations of the TCPA.

5  **GENERAL ALLEGATIONS**

6  **Publication Agreements Entered Into By and Between RMG and Third-Party Defendants**

7  16.    On or around July 21, 2012, Third-Party Defendant EWA entered into an

8  Agreement with RMG to publish RMG's Creative, specifically for the Cash Advance Diamond –

9  WEB/WAP campaign.  This Agreement required that EWA "display the Advertisement and

10  perform lead generation services described in the attached Insertion Order." (Ex. A, ¶ 1.)  The

11  Agreement further specified that any editing of RMG's Creative was "strictly prohibited, without

12  prior written approval from Reach Media Group." (Id., ¶ 4.)  Indeed, any violation of this

13  prohibition would result in the loss of payment per lead basis, pursuant to the Agreement.  (Id.)

14  Subsequently, on or around August 27, 2012, EWA agreed to publish advertisements pursuant to

15  the Quick Cash Money Loan – WEB/WAP campaign, as well.

16  17.    On or around August 9, 2012, Third-Party Defendant Lenahan entered into an

17  Agreement with RMG to publish RMG's Creatives, as well.  The terms of this Agreement were

18  identical to the terms of the Agreement entered into on RMG's website between RMG and Third-

19  Party Defendant EWA.  The Insertion Order for Ryan Lenahan detailed eight different advertising

20  campaigns, entitled: (1) Auto Loan Professionals, (2) Cash Advance Diamond, (3) Central

21  Payday Advance, (4) Honest Cash Loan, (5) Huge Cash Advance, (6) Instant Cash Express, (7)

22  Mobile Cash Source, and (8) Second Chance Cash Advance.

23  18.    Finally, on or around September 4, 2012, Third-Party Defendant Danna also

24  entered into an Agreement with RMG to publish RMG's Creative for another advertising

25  campaign.  That campaign was entitled Homeland Cash Advance.  The terms of this Agreement

26  were identical to the terms of the Agreement to which RMG and Lenahan agreed, and the terms

27  of the Agreement to which RMG and EWA agreed.

28  19.    By entering into the Agreements with RMG, Third-Party Defendants represented

1    and warranted that:

2    (1) the recipients of all email addresses used by PUBLISHER in connection with
     this Agreement have manifested affirmative consent to receive commercial emails
3    from PUBLISHER and none of the email addresses were obtained through email
     harvesting or dictionary attacks; (2) PUBLISHER will not fraudulently add leads
4    or clicks or inflate leads or clicks by fraudulent traffic generation (as determined
5    solely by Reach Media Group, such as pre-population of forms or mechanisms
     not approved by Reach Media Group); (3) PUBLISHER will not attempt in any
6    way to alter, modify, eliminate, conceal, or otherwise render inoperable or
     ineffective the Site tags, source codes, links, pixels, modules or other data
7    provided by or obtained from Reach Media Group that allows Reach Media
8    Group to measure ad performance and provide its services and **(4) all of
     PUBLISHER's efforts associated with this Agreement comply with the laws
9    of the United States, and any other laws of any other jurisdictions which are
     applicable to PUBLISHER. PUBLISHER will not engage in or promote any
10   illegal activities of any kind in association with this Agreement.**

11   (Ex. A, ¶ 11) (emphasis added).

12          20.    Furthermore, under the indemnification provision of the Agreements, each party

13   agreed to indemnify, defend and hold harmless the other party against - in part - damages, losses

14   or liabilities arising out of or relating to "any breach of any representation or warranty contained

15   in this Agreement." (Id., ¶ 16.)

16          21.    Beginning some time after July 21, 2012, Roger Dowd, President and Chief

17   Executive Officer of RMG, received a complaint from a recipient of a text message, purportedly

18   sent on RMG's behalf. The recipient complained that he received a text message advertisement,

19   which provided a link that itself linked to a website owned by RMG, but that he never provided

20   authorization to receive the text message at issue. Subsequently, Dowd received numerous other

21   complaints from recipients of text messages sent some time after July 21, 2012 purportedly on

22   RMG's behalf. RMG never authorized the transmission of any of the text messages for which

23   Dowd received complaints, including the following advertisement:

24

25   Chase is offering $1500 cash loans deposited within 2hrs. NO credit checks or
     faxing! Get the money today by applying right now on your phone at
26   TwoHourCash.net.

27          22.    As a result of these complaints, Dowd spoke with Lenahan , notifying Lenahan

28

1    that Dowd had received complaints regarding text messages purportedly sent on RMG's behalf.

2    Based upon information and belief, Dowd told Lenahan that the unauthorized text messages had

3    been sent by Lenahan and that Lenahan was in breach of the Agreement because he had sent text

4    messages on RMG's behalf that were not in compliance with the terms of the Agreement between

5    RMG and Lenahan.  Dowd also demanded that Lenahan cease sending unlawful text messages on

6    RMG's behalf.  Subsequent to these conversations with Lenahan, Dowd received additional

7    complaints regarding text messages purportedly sent on RMG's behalf.  As a result, Dowd spoke

8    with Lenahan again, demanding that Lenahan cease sending non-compliant and unlawful text

9    messages on RMG's behalf, that Lenahan provide to Dowd the OPTIN information Lenahan

10   used to determine the recipients of his text messages, that Lenahan ensure all of his marketing

11   efforts were compliant with the CAN-SPAM Act of 2003, and that Lenahan was following best

12   practices with regard to publication of advertisements.

13        23.    Lenahan failed to provide to Dowd the OPTIN information and failed to certify to

14   Dowd that his marketing efforts were compliant with the CAN-SPAM Act of 2003 and in accord

15   with best practices for publication of advertisements.  As a result, Lenahan was officially

16   suspended as a RMG publisher on or around August 26, 2012.

17        24.    Soon after, it came to RMG's attention that EWA was sending text messages,

18   purportedly pursuant to the Agreement entered into by and between RMG and EWA, which, upon

19   information and belief, were developed by Lenahan, and which were in violation of the terms and

20   conditions of the Agreement between RMG and EWA.  On or around August 31, 2012, EWA was

21   officially suspended as a RMG publisher.  Additionally, on or around September 21, 2012, Dowd

22   sent an email to Harrison Gevirtz, a co-founder of EWA, itemizing the specific problems of the

23   text messages sent by EWA.

24        25.    Upon information and belief, EWA learned that Danna was also sending text

25   messages, purportedly on behalf of RMG, not incompliance with the terms of the Agreement he

26   entered into with RMG.  On or around September 11, 2012, Danna was officially suspended as a

27   RMG publisher as well.

28        26.    As a result of Third-Party Defendants' failure to comply with the terms of the

1   Agreements and Insertion Orders, none of the Third-Party Defendants were entitled to payment

2   pursuant to the Payment provision of the Agreements, which states:

3       PUBLISHER will invoice Reach Media Group on a monthly basis at the payout rates
        reflected in the Insertion Order.  The invoice will reflect delivery of final Qualified Lead
4       numbers that are based upon numbers reported by Reach Media Group to PUBLISHER
        pursuant to the terms of this Agreement.
5

6       (Ex. A, ¶ 8.)

7       27.    RMG is informed and believes, and thereon alleges, that each of Third-Party

8   Defendants have engaged in multiple instances of unauthorized advertising through text

9   messaging.  By associating RMG's name with these unauthorized text messages, Third-Party

10  Defendants have damaged the reputation of RMG, as well as the advertising industry.

11                 **Defamation by Third-Party Defendants Lenahan and EWA**

12      28.    After RMG refused to pay Lenahan  pursuant to the Agreement on the grounds

13  that Lenahan did not comply with the terms and conditions of the Agreement, RMG is informed

14  and believes, and thereon alleges, that Lenahan posted defamatory statements about Dowd and

15  RMG on the social networking site Facebook.  Specifically, on September 28, 2012, an email was

16  sent from "Ryan Lenahan", at the email address notification+pfdvelcf@facebookmail.com, to

17  "Internet Advertising – People Who Don't Pay," at the email address

18  internetdeadbeats@groups.facebook.com, entitled "Re: [Internet Advertising – People Who Don't

19  Pay] Roger Dowd from Reach Media group owes me $13,000…".  The September 28, 2012

20  email included two comments by an individual named "Ryan Lenahan".  The first, posted at

21  10:19 pm on September 28, 2012, stated:

22
        Roger Dowd from Reach Media group owes me $13,000 and forcing me to hire
23      Harrison Gevirtz to take them to court.  I'm also aware that they owe another
        network $xx,xxx in addition to another affiliate they owe $xx,xxx. Roger claims
24      we were using "unapproved" sms content however I have countless emails, skype
        transcripts…etc where he told me to use his exact word for word message on my
25      marketing materials or else risk non payment, which I did under threat and now
        hes claiming its unapproved BS story.
26

27  The second comment was posted at 10:21 pm on September 28, 2012, and stated:

28

Roger Dowd sent a 14k wire to my partner whom was using the very same sms content, then 3 days later contacted the bank and pretended the wire they sent was fraud in attempts to get it reversed. Luckily a signed IO, invoice, emails, transcripts…etc got the bank to realize it was a BS story and stopped the fraudulent reversal.

29.    RMG is informed and believes, and thereon alleges, that these two comments were drafted by Lenahan on a public group Facebook site. The comments accuse Dowd and RMG of unjustifiably withholding funds from Lenahan, and they accuse Dowd of fraudulently reversing a bank wire. But Lenahan was well aware that neither accusation was true.

30.    At least one of these postings has already damaged RMG's excellent reputation with one of its larger clients. In its correspondence with RMG, this client notified RMG that it had seen the second September 28, 2012 comment and it further indicated to RMG that it would require a personal guarantee or prepayment in future engagements with RMG.

31.    Similarly, after RMG refused to pay EWA for publication services it performed purportedly pursuant to the Agreement on the grounds that EWA breached the terms and conditions of the Agreement, RMG is informed and believes, and thereon alleges, that one of EWA's co-founders, Ryan Eagle ("Eagle"), also posted a defamatory comment about Dowd and RMG on Facebook. Specifically, on September 21, 2012, an email was sent from an individual named "Ryan Eagle", at the email address notification+pfdvelcf@facebookmail.com, to "Internet Advertising – People Who Don't Pay," at the email address internetdeadbeats@groups.facebook.com, entitled "[Internet Advertising – People Who Don't Pay] Roger Dowd – We're having a little flack from…". The September 21, 2012 email included the following comment, posted at 11:58 a.m.:

Roger Dowd – We're having a little flack from him, anyone having any problems? I heard he was a good guy so I'm a bit surprised.

Additionally, RMG is informed and believes, and thereon alleges, that on or around September 21, 2012, Eagle posted the following message on Dowd's personal Facebook page:

DLA Piper LLP (US)
San Francisco

THIRD-PARTY COMPLAINT
CASE NO. 5:12-CV-04759 (PSG)

Hey Roger – We're apparently having some problem with getting paid by you. I was wondering if you could get that through to us consider you hold such a good name in the industry. Thanks a lot pal

32.     These two postings suggest that Dowd unjustifiably withheld funds owed to EWA. But EWA was well aware that this accusation was not true.

33.     As a result of the defamatory postings by Lenahan and Eagle, RMG's counsel, DLA Piper LLP (US), sent cease and desist letters by Federal Express and e-mail to Lenahan and Eagle on October 15, 2012, demanding that they cease and desist from this conduct and from engaging in further unlawful conduct directed at Dowd and RMG, and that they confirm their compliance with these demands in writing to the offices of DLA Piper LLP (US) no later than Monday, October 22, 2012.  RMG's counsel never received confirmations in writing from either Lenahan or Eagle.  Moreover, on November 4, 2012, another email was sent from "Ryan Lenahan", at the email address notification+pfdvelcf@facebookmail.com, to "Internet Advertising – People Who Don't Pay," at the email address internetdeadbeats@groups.facebook.com, entitled "Re: [Internet Advertising – People Who Don't Pay] Roger Dowd from Reach Media group owes me $13,000…".  The November 4, 2012 email included another comment by the individual named "Ryan Lenahan" stating "Just an update, over 3 months have passed and have still not seen a dime."  Additionally, the email included two comments by other individuals to Ryan Lenahan's September 28, 2012 11:19 p.m. defamatory comment about Dowd and RMG.  They said "Good to know, thanks for the heads up" and "oh my. . . not going near that network".  As evidenced by these comments and those of one of RMG's largest clients, it is evident that Lenahan's defamatory statements about Dowd and RMG have already injured their reputation in the publishing network and advertising industries.

## COUNT I

### Breach of Warranty Against All Third-Party Defendants

34.     RMG incorporates by reference Paragraphs 1 through 33 as if fully set forth herein.

35.     Third-Party Defendants, and each of them, were obligated to comply with the Terms and Conditions of the Agreements.  Pursuant to the Agreements, Third-Party Defendants, and each of them, represented and warranted that all their efforts associated with the Agreements complied with the laws of the United States, and any other laws of any other jurisdictions applicable to each of them, and that they would not engage in or promote any illegal activities of any kind in association with the Agreements.

36.     RMG is informed and believes, and thereon alleges, that Third-Party Defendants, and each of them, independently breached their warranties to RMG by sending text messages to cellular phone numbers without the prior express consent of the called parties, in violation of federal law.

37.     To the extent Plaintiff and members of the purported Class have suffered any damage as a result of these text messages, each of the Third-Party Defendants' conduct solely, actually and proximately caused those damages.

## COUNT II

### Breach of Contract Against All Third-Party Defendants

38.     RMG incorporates by reference Paragraphs 1 through 37 as if fully set forth herein.

39.     Third-Party Defendants, and each of them, were obligated to comply with the Terms and Conditions of the Agreements.  Under the Agreements, each of them were prohibited from editing RMG's Creatives without RMG's written prior approval.

40.     RMG is informed and believes, and thereon alleges, that Third-Party Defendants, and each of them, independently breached this obligation by sending text messages to cellular phone numbers which language did not comply with RMG's Creatives, although none of the Third-Party Defendants received RMG's prior written approval for any change to the Creatives.

## COUNT III

### Libel Per Se Against Third-Party Defendants Lenahan and EWA

41.     RMG incorporates by reference Paragraphs 1 through 40 as if fully set forth herein.

42.     RMG is informed and believes, and thereon alleges, that Third-Party Defendant Lenahan published on a Facebook public group page at least two written, false, and unprivileged comments about Dowd and RMG and that Third-Party Defendant EWA's cofounder Eagle published on a Facebook public group page at least one written, false, and unprivileged comment about RMG.  Lenahan accused Dowd and RMG of unjustifiably withholding funds from Lenahan and accused Dowd of fraudulently reversing a bank wire.  Additionally, EWA's co-founder Eagle accused RMG of unjustifiably withholding funds from EWA.

43.     These written statements and communications are defamatory on their face, as they attack both RMG's and Dowd's business reputations and Dowd's trustworthiness, falsely indicating that RMG and Dowd have unjustifiably withheld funds in the past in business dealings. As a result of Lenahan's conduct, RMG's relationship with one of its largest clients has already deteriorated, and both Lenahan's and EWA's conduct have undermined RMG's strong reputation in the publisher network and advertising industries.

44.     Unless restrained by order of the court, Third-Party Defendants Lenahan and EWA will continue to wrongfully attempt to harm RMG's and Dowd's strong reputation in the publisher network and advertising industries, for which damages will not afford adequate relief. Therefore, RMG seeks injunctive relief, among other relief.

## COUNT IV

### Tortous Interference with Contractual Relations Against Third-Party Defendant Lenahan

45.     RMG incorporates by reference Paragraphs 1 through 44 as if fully set forth herein.

46.     As a leading performance based publisher network, RMG has multiple contractual relations with customers seeking advertising services, from which RMG draws significant profits.

47.     Third-Party Defendant Lenahan, a self-proclaimed publication expert, is well

1  aware of RMG's strong reputation in the advertising industry and the existence of these multiple

2  contracts.

3      48.    When Lenahan published on a Facebook public group page false, unprivileged

4  information about Dowd and RMG, accusing Dowd and RMG of unjustifiably withholding funds

5  from Lenahan and accusing Dowd of fraudulently reversing a bank wire, Lenahan committed

6  libel.

7      49.    Not only was it reasonably foreseeable that Lenahan's libelous conduct would

8  interfere with or disrupt these contractual relations, but Lenahan's wrongful conduct was intended

9  and designed to interfere with RMG's contractual relations. His conduct was grossly negligent,

10  and as a result, at least one of RMG's contractual relations has already deteriorated.

11     50.    Unless restrained by order of the court, Third-Party Defendant Lenahan will

12  continue to wrongfully attempt to harm RMG's and Dowd's strong reputation in the publisher

13  network and advertising industries, for which damages will not afford adequate relief. Therefore,

14  RMG seeks injunctive relief, among other relief.

**COUNT V**

**Tortuous Interference With Prospective Economic Advantage Against Third-Party**

**Defendant Lenahan**

18     51.    RMG incorporates by reference Paragraphs 1 through 50 as if fully set forth

19  herein.

20     52.    As a leading performance based publisher network, RMG has multiple contractual

21  relations with customers seeking advertising services, from which RMG draws significant profits.

22     53.    Third-Party Defendant Lenahan, a self-proclaimed publication expert, is well

23  aware of RMG's strong reputation in the advertising industry and the existence of these multiple

24  contracts.

25     54.    When Lenahan published on a Facebook public group page false, unprivileged

26  information about Dowd and RMG, accusing Dowd and RMG of unjustifiably withholding funds

27  from Lenahan and accusing Dowd of fraudulently reversing a bank wire, Lenahan committed

28  libel.

DLA PIPER LLP (US)
SAN FRANCISCO

-13-

THIRD-PARTY COMPLAINT
CASE NO. 5:12-CV-04759 (PSG)

1     55.    Not only was it reasonably foreseeable that Lenahan's libelous conduct would

2  interfere with or disrupt these contractual relations, but Lenahan's wrongful conduct was intended

3  and designed to interfere with RMG's contractual relations and prospective economic advantage.

4  His conduct was grossly negligent, and as a result, at least one of RMG's contractual relations has

5  already deteriorated.

6     56.    Unless restrained by order of the court, Third-Party Defendants Lenahan will

7  continue to wrongfully attempt to harm RMG's and Dowd's strong reputation in the publisher

8  network and advertising industries, for which damages will not afford adequate relief.  Therefore,

9  RMG seeks injunctive relief, among other relief.

10               **PRAYER FOR RELIEF**

11  WHEREFORE, RMG respectfully requests that this Court enter judgment in its favor and against

12  Third-Party Defendants, and each of them, and that this Court award the following relief to RMG:

13     A.    A declaratory judgment that Third-Party Defendants, and each of them, breached

14          their respective Agreements and warranties within those Agreements and should

15          be held individually liable to RMG for any loss or damage RMG incurs as a result

16          of Plaintiff's lawsuit;

17     B.    A declaratory judgment that the breaches of contract and warranty by Third-Party

18          Defendants, and each of them, were the actual and proximate cause of any injuries

19          and damages sustained by Plaintiff and other members of the purported Class;

20     C.    Judgment against Third-Party Defendants compelling them to pay in full to RMG

21          any loss or damage incurred by RMG as a result of Plaintiff's lawsuit;

22     D.    Injunctive relief enjoining Third-Party Defendant Lenahan and Third-Party

23          Defendant EWA, their principals, agents, servants, employees, successors, and

24          assigns, from doing any other act or making any other statements tending to, or

25          likely to result in damage to Third-Party Plaintiff's reputation or business, and

26          from continuation of these unfair, unlawful, and/or fraudulent business practices.

27     E.    An award to RMG for its attorneys' fees and costs for bringing the Third-Party

28          Complaint; and

1    F.     Such other or further relief as this Court may deem just and proper.

2    Dated:  November 15, 2012

3                                                  DLA PIPER LLP (US)

4
                                                   By:_____
5                                                     VISHALI SINGAL
                                                      Attorneys for Defendant
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-

# EXHIBIT A

**TERMS AND CONDITIONS**

The following terms and conditions (this "Agreement") is a legal agreement between Reach Media Group ("Reach Media Group"), and PUBLISHER. PUBLISHER and Reach Media Group may also be individually referred to herein as a "Party" and collectively as "Parties." If there is any conflict between these Terms and Conditions and the Insertion Order(s), the Insertion Order(s) shall control.

**1.) Service**: PUBLISHER will display the Advertisement and perform lead generation services described in the attached Insertion Order. "Advertisement" means the advertisement, including any copy including questions and or text ads, graphic, sound, video, programming code and/or other content that comprises the advertisement, as well as the websites to which an advertisement is linked if applicable.  Reach Media Group hereby grants to PUBLISHER during the Contract Period a non-exclusive, royalty-free, worldwide right and license by all means and in any media, whether now known or hereafter discovered, to use, reproduce, distribute, publicly perform, publicly display and digitally perform such Advertisement and all its constituent parts.

**2.) Qualified Lead Definition (Qualified Leads):** Qualified Leads are prospects who meet Reach Media Group's screening criteria as described in the Insertion Order and who provide their complete contact data.  PUBLISHER will be paid on a delivered per lead basis defined as when a user agrees through a pre approved opt-in method to be contacted.  In the case of any dispute between the parties as to the number of Qualified Leads, Reach Media Group's numbers will control.

**3.) Lead Validation Procedure:**
Reach Media Group will verify each Qualified Lead delivered by the PUBLISHER.  Upon receipt, all Qualified Leads will be checked for data validity (i.e. containing valid data inputs for the fields specified in the Insertion Order) and uniqueness of data (i.e. that the Qualified Leads are not present in Reach Media Group's database for the designated Advertisement in the past 60 days).  Reach Media Group reserves the right to send an auto-responder to all respondents re-confirming their request for information.   Any objections from respondents (about the email, or the offer) will be raised to the PUBLISHER.

**4.) Creative Changes**:  Editing of Reach Media Group's Creative is strictly prohibited, without prior written approval from Reach Media Group.  Creative includes, but is not limited to, text ads, graphic ads, from and subject line, any copy associated with the campaign including survey questions and answers.  Any changes to Creative, without prior written permission will result in the loss of payment of Leads.

**5.) Compliance**:  Reach Media Group will actively monitor PUBLISHER activity using a combination of its proprietary software and third party monitoring services.  It is the obligation of PUBLISHER to prove to Reach Media Group that they are not committing fraud.  Reach Media Group will hold PUBLISHER payment in 'Pending Status' until PUBLISHER has satisfactorily provided evidence that PUBLISHER is not defrauding the system.  Reach Media Group flags accounts that:  Have click-through rates that are much higher than industry averages and where solid justification is not evident; Have only click programs generating clicks with no indication by site traffic that it can sustain the clicks reported; Have shown fraudulent leads as determined by our clients or Use fake redirects, automated software, and/or fraud to generate clicks or leads.  If PUBLISHER is unable to prove to Reach Media Group that PUBLISHER is not committing fraud, PUBLISHER will forfeit its entire commission for all programs and PUBLISHER's account will be terminated.  Reach Media Group reserves sole judgment in determining fraud.

**6.) Advertising Guidelines**:  PUBLISHER may, in its complete discretion, reject, cancel or remove at any time any Advertisement from the service for any reason without prior notice to Reach Media Group.  PUBLISHER must notify Reach Media Group following the rejection, cancellation or removal of any Advertisement from the service within 24 hours.

**7.) Term & Target Launch**: Term will be one (1) month from the target launch of the initial campaign as noted in the Insertion Order.  Agreement may continue thereafter by mutual consent but may be terminated by either party for any reason whatsoever.  All legitimate moneys due to PUBLISHER will be paid during the next billing cycle.  If PUBLISHER defrauds the system, then payment is revoked as determined solely by Reach Media Group.

**8.) Payment**: PUBLISHER will invoice Reach Media Group on a monthly basis at the payout rates reflected in the Insertion Order. The invoice will reflect delivery of final Qualified Lead numbers that are based upon numbers reported by Reach Media Group to PUBLISHER pursuant to the terms of this Agreement.

**9.) Payment Term**: Reach Media Group shall make all payments to PUBLISHER within 30 days of the Invoice Date. All payments made to PUBLISHER do not include, and PUBLISHER shall pay, any sales, use or similar tax associated with such payment. All past due amounts shall accrue interest at the rate of one and one-half percent (1.5%) per month or the maximum rate allowed by law, whichever is greater. Parties shall keep, maintain and preserve, for the term of this Agreement and for one (1) year thereafter, accurate records relating to amounts due hereunder (the "Relevant Records"). Either party shall have a right at least once per calendar year to audit the Relevant Records of the other party for the purpose of verifying fulfillment of party's payment obligations pursuant to this Agreement. Each audit will be conducted at a place agreed to by the parties, during the normal business hours, with at least ten (10) business days prior written notice to party to be audited. Auditing party shall pay the fees and expenses of the audit, unless the audit reveals a payment discrepancy of more than ten percent (10%) of all payments due in any consecutive six (6) month period, in which case audited party shall pay the reasonable fees and expenses of the audit, and shall immediately pay to auditing party all amounts found to be due.

**10. Reach Media Group Representations and Warranties.** The execution, delivery, and performance of this Agreement by Reach Media Group has been duly approved by its board of directors or managing partners/members, and no further corporate action is necessary on the part of Reach Media Group to consummate the transactions contemplated by this Agreement.

**11.) PUBLISHER Representations and Warranties:** Publisher represents and warrants that: (1) the recipients of all email addresses used by PUBLISHER in connection with this Agreement have manifested affirmative consent to receive commercial emails from PUBLISHER and none of the email addresses were obtained through email harvesting or dictionary attacks; (2) PUBLISHER will not fraudulently add leads or clicks or inflate leads or clicks by fraudulent traffic generation (as determined solely by Reach Media Group, such as pre-population of forms or mechanisms not approved by Reach Media Group); (3) PUBLISHER will not attempt in any way to alter, modify, eliminate, conceal, or otherwise render inoperable or ineffective the Site tags, source codes, links, pixels, modules or other data provided by or obtained from Reach Media Group that allows Reach Media Group to measure ad performance and provide its services and (4) all of PUBLISHER's efforts associated with this Agreement comply with the laws of the United States, and any other laws of any other jurisdictions which are applicable to PUBLISHER. PUBLISHER will not engage in or promote any illegal activities of any kind in association with this Agreement.

**12.) Other Obligations**: PUBLISHER shall:

A. NOT PROVIDE Incentivized traffic. This includes but is not limited to any spoofing, redirecting or trafficking from adult related websites in an effort to gain traffic or websites that are point, lottery, coupon or rewards based and encourage users to click on Advertisements or use Advertisements to generate revenue for users to win points, get rewards, or other any other incentive.

B. NOT PROVIDE leads generated from content, email or websites that are not subject matter related to the category of the Advertisement represented. Such websites must be content-based (not a list of links or advertisements), be written in English, receive a minimum of unique page views per month, have a top-level name and must not infringe on any personal, intellectual property or copyrights. This can be waived only by SPECIFICALLY providing the name of the proposed website to Reach Media Group.

C. Be able to provide the name of the Website where the lead was generated. This information is only delivered to Reach Media Group upon request, but MUST be made available in case there is a dispute or problem with the lead.

D. NOT PROVIDE inappropriate content, which includes, but is not limited to, content that (i) promotes the use of alcohol, tobacco or illegal substances, nudity, sex, pornography adult-oriented content such as phone sex or escort services, expletives or inappropriate language, (ii) promotes violence or the use of illegal substances or activities such as how to build a bomb, counterfeiting money and software pirating (iii) promotes illegal or unethical activity, racism, hate, "spam", mail fraud,

gambling, sweepstakes, pyramid schemes, or illegal advice (iv) is otherwise prohibited by Federal or state law; and/or (v) will bring Reach Media Group and/or its associated Advertisers negative publicity.

E.   At no time, engage in, disseminate, promote or otherwise distribute any Advertisement through the use of contextual media, specifically downloadable software (also called adware, pop-up/pop-under technologies, plug-ins, and other names as applicable).

F.   Email Campaigns.  PUBLISHER further represents and warrants that with respect to email campaigns transmitted by PUBLISHER for Reach Media Group, PUBLISHER shall at all times only use the Reach Media Group email creative provided by Reach Media Group, maintain strict compliance with the Controlling the Assault on Non-solicited Pornography and Marketing Act of 2003 (CAN-SPAM) and any amendments and modifications thereto.

**13.) Confidentiality**:  The terms of this Agreement are confidential and shall not be disclosed to any third party except where required by law.  All information submitted by end-user customers pursuant to this Agreement is proprietary to and owned by Reach Media Group. Such customer information is confidential and may not be disclosed by Reach Media Group or PUBLISHER. In addition, PUBLISHER acknowledges that all non-public information, data and reports received from Reach Media Group hereunder or as part of the services hereunder is proprietary to and owned by Reach Media Group.  ("Confidential Information").  PUBLISHER agrees not to disclose the terms of this Agreement, including the CPA value, to any third party without the express written consent of Reach Media Group, and that such constitutes Confidential Information.  All Confidential Information is or may be protected by copyright, trademark, trade secret and other intellectual property law, as appropriate. PUBLISHER agrees not to reproduce, disseminate, sell, distribute or commercially exploit any proprietary or Confidential Information in any manner. These non-disclosure obligations shall survive the termination of this Agreement for a period of five (5) years.  This section does not bind Reach Media Group or PUBLISHER in the event such information is required to be disclosed by operation of law. If a request is made of PUBLISHER to disclose such information, PUBLISHER must immediately inform Reach Media Group via written notice sufficiently promptly to allow Reach Media Group to seek a Protective Order prior to the time commanded to produce or disclose such Confidential Information, and PUBLISHER agrees to cooperate in whatever way Reach Media Group requests to attempt to protect that information from disclosure by operation of law.  Subject to prior approval by PUBLISHER, Reach Media Group may publicly announce its contractual relationship with PUBLISHER, which includes being on a listing of Reach Media Group publishers in general corporate materials and in industry standard press releases.

**14. DISCLAIMER OF WARRANTIES**: Reach Media Group PROVIDES ITS SITES AND THE SITES OF ITS AFFILIATES AND PARTNERS, AND ALL ITS SERVICES AND THE SERVICES OF ITS AFFILIATES AND PARTNERS, AS PERFORMED HEREUNDER, ON AN "AS IS," "WHERE IS" AND "AS AVAILABLE" BASIS. Reach Media Group DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

**15. LIMITATIONS OF LIABILITY**: IN NO EVENT SHALL Reach Media Group BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, FOR BREACH OF CONTRACT, WARRANTY, NEGLIGENCE OR STRICT LIABILITY), OR FOR INTERRUPTED COMMUNICATIONS, LOSS OF USE, LOST BUSINESS, LOST DATA OR LOST PROFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. UNDER NO CIRCUMSTANCES SHALL Reach Media Group BE LIABLE TO PUBLISHER OR ANY THIRD PARTIES FOR ANY REASON.

**16.) Indemnification:**  Each party agrees to indemnify, defend and hold harmless the other party and its employees, agents, officers and directors, against any and all claims, causes of actions, judgments, demands, damages, losses or liabilities, including costs and expenses (including reasonable attorneys fees and costs of suit), arising out of or relating to (a) any claim based upon  infringement of copyright, trademark, patent, or trade secret or other intellectual property right of any third party; (b) any claim, representation, or statement made in the Advertisement; (c) any breach of any representation or warranty contained in this Agreement.

**17. Dispute Resolution:**  If any dispute arises under this Agreement, the Parties agree to first try to resolve the dispute with the help of a mutually agreed upon mediator in the following location:  State of Georgia, Fulton County.  Any costs and fees other than attorneys' fees associated with the mediation shall be shared equally by the parties.  If it proves impossible to arrive at a mutually satisfactory solution through mediation, the Parties agree to submit the dispute to binding arbitration in the following location:  State of Georgia, Fulton County. The Parties agree that the binding arbitration will be conducted under the rules of the American Arbitration Association.  Judgment upon the award rendered by the arbitrator may be entered in any court with proper jurisdiction.  If any litigation or arbitration is absolutely necessary to enforce this Agreement or the terms thereof, the prevailing Party shall be entitled to reimbursement by the other Party for reasonable attorneys' fees, costs and expenses.  This Agreement will be governed by the laws of the State of Georgia.

**18. No Assignment:** Neither Party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other Party; provided, however, that a successor in interest by merger, by operation of law, assignment, purchase or otherwise of all or substantially all the business of a Party may acquire its rights and obligations hereunder.  Any prohibited assignment shall be null and void.

**19. Independent Contractor:**  Each party is an independent contractor.  Except as set forth in this Agreement, neither party is authorized or empowered to obligate the other or incur any costs on behalf of the other without the party's prior written consent.

**20. Severability:** If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement shall remain in full force and effect and shall in no way be affected or invalidated.

**21. Entire Agreement; Modification:**  This constitutes the entire agreement between the parties and supersedes any prior or inconsistent agreements, negotiations, representations and promises, written or oral, regarding the subject matter. No modification, course of conduct, amendment, supplement to or waiver of this Agreement or any provisions hereof shall be binding upon the parties unless made in writing and duly signed by both parties.

**22. Agreement in Counterparts:** This agreement may be signed by Reach Media Group and PUBLISHER in counterparts, and facsimile signatures, and check box acknowledgement shall have the same force and effect as an original signature.