# Exhibit B

# REACH Media Group
## MARKETING & DISTIBUTION AGREEMENT

**THIS AGREEMENT** (the "Agreement") dated July 12, 2012 (the "**Effective Date**"), by and between REACH Media Group LLC, with its principal place of business at 3715 Northside Pkwy, Building 100 Suite 300 Atlanta, Georgia 30327 (the "**Marketer**") and _____, with its principal place of business _____ (the "**Company**"). Marketer and Company together shall be individually referred to as a "Party" or collectively referred to as the "Parties."

**WHEREAS**, the Parties desire to enter into a strategic marketing relationship pursuant to which Marketer shall assist the Company to offer certain products and services for sale to the public via the internet or other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Definitions.</u>

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Advertisements**" means privately branded sponsorship messages, banner advertisements, interstitials and buttons developed by Company promoting the Private Label Products for on-line promotions executed by Marketer on the Marketer Site.

"**Marketer Site**" means the World Wide Web site that Marketer hosts for Company to promote Company products.

"**Company Products**" means Company is in the business, among other things, of offering for sale and offering fulfillment and customer service to persons enrolled in Company products/services ("Company Products").

"**Valid Application**" means an order placed for a Product/Service that results in Company receiving a full and complete application from the Customer for Company's Products/Services.

"**Valid Lead**" means Company receiving individual consumer information off of a Marketer Site.

"**Order Form**" means an on-line purchase process and purchase order form for prospective customers to order Company Products/Services and/or a form with enough consumer specific information to qualify as a lead.

2. <u>Term; Principal Covenants of the Parties.</u>

   2.1   Company hereby engages the Marketer for a period commencing on the Effective Date and ending on the last day of the twelfth (12th) consecutive month thereafter (the "**Initial Term**"), to promote offers for Company Products/Services via the internet. Unless sooner terminated pursuant to Section 16 herein, this Agreement shall be automatically renewed for consecutive twelve (12) month terms unless thirty (30) days prior written notice is provided by one party to the other advising of its intent not to renew.

3. <u>The Responsibilities of Company.</u>

   3.1   Company shall process and fulfill Valid Applications for Company Products within a reasonable time period following its receipt of a valid application from marketer.

   3.2   Company shall be solely responsible for the procurement of the Products/Services from its suppliers (the "Suppliers"). The products/services sold shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the products.

   3.3   Company shall remit valid application royalties and valid lead royalties to the Marketer in accordance with Section 7 hereof.

4. The Responsibilities of the Marketer.

    4.1    Marketer shall create unique and standalone web generated lead generation/online acquisition campaigns for the purpose of creating online sales and lead generation for Company Products.

    4.2    The Marketer shall actively promote and market the Company Products during the Initial Term as described in this Section 4. Said promotion and marketing of companies products shall include but not be limited too building a web site for the product and developing and email, button and banner campaign for marketers affiliate network.

    4.3    Both Parties shall use best efforts to promptly report to the other Party any malfunctions adversely affecting the Company Site and shall take all actions reasonably required to restore access to the Site.

    4.4    The Marketer shall not make representations regarding the Products/Services, other than those approved or distributed by Company or any of its Suppliers, unless otherwise authorized in writing by Company.

    Marketer will use its best efforts to insure that all applications/leads received and delivered to Company are accurate.

5. Customer Support. Company shall manage the customer support services provided to Customers with respect to the Products/Services, including, without limitation, account maintenance, billing and collections with respect to products/services, and customer support activities. Customer support activities may be provided, under certain circumstances, by one or more of the Suppliers. Company shall in all events manage billing and collections with respect to services. The Marketer shall direct inquiries relating to customer support services to Company.

6. Links.
Advertisements may be branded with the name and mark of the Company, subject to the restrictions set forth in Section 9, but shall, in any event, serve to promote the sale of Products/Services.

7. Payments.

    7.1 As material consideration for the Marketer's marketing commitment, set forth in Section 4 hereof, Company shall pay to the Marketer upon the distribution of the Products/Services the following:

    (a)    See attached IO.

    (b)    Payment Terms – Royalties generated from valid applications/leads delivered to Company and are billed bi-weekly Net 7.

    (c)    Should that day be a banking holiday, then the royalties are due the following business day.

    (d)    All royalty remittances from Company to Marketer will be made by Bank wire transfer

    7.2 Collections – All unpaid balances will be considered to be past due 15 days after due date for any particular period. The parties agree that Marketer shall be entitled to any and all reasonable fees incurred to collect on all past due invoices including but not limited to attorney's fees. Furthermore, all past due invoices will accrue interest at a rate of 18% per annum.

8. Non-Disclosure of Proprietary Information.

8.1 Both Parties acknowledge that during the Initial Term of this Agreement they may come into possession of or become acquainted with certain Proprietary Information (as hereinafter defined) of the other party. The term "Proprietary Information" shall mean all information of a private, secret or confidential nature including but not limited to, information related to the disclosing party's business, business relationships or financial affairs, whether or not marked or otherwise designated as "confidential" or "proprietary" or with a similar legend indicating its proprietary nature. The terms of this Agreement shall be treated as Proprietary Information.

8.2 The term "Proprietary Information" shall not include information that: (i) is or becomes generally known or available by publication or otherwise through no fault of the receiving party; (ii) is already rightfully in the receiving party's possession without restriction prior to its receipt from the disclosing party; (iii) is independently developed or learned by the receiving party; or (iv) is lawfully obtained by the receiving party from a third party that has the right to make such disclosure.

8.3 Disclosure/Use Restrictions. Neither Party shall, directly or indirectly (i) disclose Proprietary Information to any person or entity other than its employees, and then only in the event that such employees agree in writing to be bound by the terms of this Section 8; or (ii) use Proprietary Information for its own benefit or for the benefit of any other person or entity, except as specifically authorized by the other Party.

8.4 Required Disclosures. In the event that a Party is required by applicable law, rule or regulation, or pursuant to the order of any court or governmental authority of competent jurisdiction to disclose Proprietary Information of the other Party, such Party shall use commercially reasonable efforts to (i) provide the other Party with at least ten (10) business days prior written notice of such disclosure; and (ii) limit such disclosure to the extent practicable.

9. Ownership; Non-Solicitation; Non-Competition.

9.1 Ownership.

(a) All tangible information, including but not limited to any drawings, designs, information or specifications submitted by Marketer to the Company with respect to the Web Site or the Advertisements, shall at all times be, and shall be deemed to be, the property of Marketer. Notwithstanding anything to the contrary contained herein, the Company Marks shall at all times be, and shall be deemed to be, the property of the Company.

(b) Information pertaining to individual Customers obtained by Marketer in connection with the sale of Company Products through the Marketer Site if either a valid application or a valid lead shall at all times be, and shall be deemed to be owned by the Company. Information pertaining to individual Customers obtained by Marketer in connection with the sale of Company Products through the Marketer Site that does not result in either a valid application or a valid lead shall at all times be, and shall be deemed to be owned by the Marketer. In both instances provided, however, that all such information shall be used in accordance with applicable law.

(c) All additional revenue generated by Marketer Site shall belong to Marketer.

10. Grant of License.

(a) Company hereby grants to the Marketer a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of Company (collectively, the "**Company Marks**") solely in connection with the promotion and sale of the Products/Services through the Marketer Site. The Marketer acknowledges that the Company Marks are the sole property of Company and, other than the license granted herein, nothing shall be construed to grant the Marketer any right, title or interest in or to the Company Marks.

(b) Company reserves the right to approve the form and placement of their respective Marks on the Marketer Site, the Advertisements, or any materials used to promote the Products/Services of the Company, such approval not to be unreasonably withheld or delayed.

11. Representations and Warranties.

Each Party represents and warrants to the other Party the following:

(a) <u>Authority; Compliance</u>. The representing Party has all right, title and power necessary to perform its obligations hereunder and is in compliance with all federal, state and local laws material to the conduct of its business and necessary for its performance of this Agreement.

(b) <u>No Infringement</u>. The Marks of the representing Party and all content provided by the representing Party or its affiliates for inclusion in any promotional materials distributed by the representing Party and/or in connection with offer and the sale of the Products/Services, do not and will not, to the knowledge of the representing Party, infringe upon or otherwise violate any copyright, trade secret, trademark, patent, invention, privacy, or non-disclosure rights (collectively, the "Intellectual Property Rights") of any third party. The representing Party further represents and warrants that it owns or has sufficient rights in and to all of its marks to grant to the other Party the license described in Section 10.

(c) <u>No Objectionable Material</u>. The Marketer Site and any other promotional materials prepared and distributed by the Marketer or its affiliates in connection with the offer and sale of the Products/Services do not and will not contain any material that (i) is intentionally misleading or deceptive, or (ii) is known to be libelous, defamatory, obscene, or pornographic, intended to harass or annoy, or which violates any civil or criminal laws.

12. <u>Disclaimer of Warranties</u>.

**EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 11 ABOVE, EACH PARTY EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, GUARANTEES, AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR INTENDED USE.**

13. <u>Indemnification</u>.

13.1 Each Party shall indemnify and hold the other party harmless from and against any and all damages, liabilities, costs and expenses (including reasonable attorney's fees) arising from or relating to such Party's breach of any of the representations or warranties set forth in Section 11. Each Party shall notify the other promptly of any claim for which the other is responsible hereunder, and shall cooperate with the other in every reasonable way to facilitate the defense of any such claim.

14. <u>Independent Contractor</u>. Each Party agrees that neither Party is an employee, attorney-in-fact, agent, partner or joint venture of the other Party for any purpose and does not have the authority, actual or implied, to bind the other Party to any contract or obligation, other than to fulfill purchase orders for the Financial Products, to the extent that such products are pursuant to this Agreement. The Marketer is, and shall be deemed to be, an independent contractor. All costs and expenses of performing a Party's duties hereunder shall be borne solely by the Party performing such duties.

15. <u>Termination</u>.

15.1 <u>Termination</u>. This Agreement shall be terminated:

(a) by either Party, upon ten (10) days prior written notice, in the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;

(b) by either Party, upon five (5) day written prior written notice, in the event that the other Party (i) has committed any act of fraud against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers, or (iii) fails to comply with the policies related to this Agreement, of which the such Party has received prior written notice; or

(c) By either Party in the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within fifteen (15) days of its receipt of notice of such breach.

16. <u>Assignment</u>. Neither of the Parties may, without the other Parties' prior written consent, which shall not be unreasonably withheld, assign or transfer this Agreement, or any of its rights or obligations under this Agreement to any person ("Assignee") except as part of the sale of all or substantially all of the assets of the Party or merger of the Party; provided, however, that the Assignee agrees to fully perform and be bound by the provisions of this Agreement.

18. **Notices**. All notices permitted or required hereunder shall be in writing and shall be deemed to have been given (i) upon personal delivery; (ii) one (1) day following deposit with an overnight courier that keeps written records of its deliveries; or (iii) three (3) days following deposit as certified mail, return receipt requested, addressed to the party at the address first written above.

19. **Governing Law; Consent to Jurisdiction**. This Agreement shall be construed and governed by the laws of the State of Georgia, without regard to the conflicts of law provisions thereof.

20. **Expenses**. Except as otherwise provided herein, each party shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such Party in preparation for performing its obligations under this Agreement.

21. **Invalidity**. In the event that any one or more of the provisions contained herein or in any instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable, then to the maximum extent permitted by law, such provision or provisions shall be judicially reformed consistent with the parties' intentions so as to be valid, legal and enforceable, and such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or such other instrument.

22. **Arbitration**. Any and all disputes arising out of or in connection with this Agreement shall be finally settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration proceeding shall take place in Atlanta, Georgia and any award rendered shall be final and binding upon the parties. Judgment of any such award may be entered in any court having jurisdiction over the parties or their assets. The costs of arbitration shall be shared equally by the parties. Each party will pay its own attorney's fees and costs.

23. **Survival**. The obligations of the Parties under Sections 8, 9, and 13 shall survive the termination of this Agreement.

24. **Construction; Amendments and Waivers**. The Agreement, together with any exhibits attached hereto, constitutes the entire agreement of the Parties concerning the subject matter hereof and supercedes all prior agreements, understandings and discussions, whether oral or written, of the Parties. No modification or waiver of this Agreement shall be binding unless such modification or waiver is set forth in a writing that is signed by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided otherwise.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed on the date first written above.

**REACH Media Group, LLC. (Marketer)**                    **(Company)**

Name    Randy Mitchelson                                   Name
Title   CMO                                                Title  CEO


Date                                                       Date